So, why don't we start with the first case, which is docket number 20-1193. And I'm going to ask appellant's counsel for help pronouncing his client's name. I think it's Myo versus Oppenheimer and Company. So Mr., is it Lacool? Yes, Your Honor. And did I pronounce your name properly? You did pronounce my name properly. And my client's name is Y. No. Why no? Okay. Thank you very much. And then for the appellee, we have Mr. Gibson. Yes. Good morning, Your Honor. Okay. Great. So, you can both see and hear us, I trust? Yes. Yes. Okay. Let's see. So, Mr. Lacool, looks like you will have eight minutes to begin and you've reserved two minutes for rebuttal. Is that right? That's correct. Okay. So, why don't we kick it off there with Mr. Lacool? Go ahead. Good morning, Your Honors. My name is Valdi Lacool. I represent the plaintiff appellant, Mr. No. The district court here erred in both compelling arbitration and then denying Mr. No's motion to vacate that arbitration award. With respect to the first issue, the threshold issue of compelling arbitration, New York law is clear that an agreement to arbitrate must be clear, explicit, and unequivocal. If it requires implication or subtlety, there is no agreement to arbitrate. And the New York Court of Appeals is equally clear that a handbook, that a disclaimer, a no-contract disclaimer within a handbook is dispositive, holding that there is no contractual intent. In this particular case, there was a handbook that repeatedly said it is not a contract. It represents guidelines and general reference guide only. New York law makes clear that this is dispositive here. There can be no express or implied contract as a result. And as the New York Court of Appeals held in Lubasco, this prevents the creation of a contract. That disclaimer cannot be overcome by implication or implied, in fact, contract. In fact, the text of the operative documents makes that clear. Mr. No signed an acknowledgment form in connection with the handbook. That acknowledgment form, which is on page 114, states this handbook is not a contract of employment expressed or implied. That means that you cannot have a contract by looking to the layout of the document to see if there are sections that are distinct, by looking to the mandatory nature of its language, or by conduct. More importantly, perhaps, the disclaimer of no express contract means that Mr. No could not sign pages of that document saying, I agree that this is a contract. Neither one of those is permissible. Mr. LaCoulle, on that last point, you said he couldn't sign pages saying it's a contract. I'm looking at page 61 of the joint appendix, which appears to be a document, an electronic signature through Adobe, with two acknowledgments. It's one, understanding and acknowledging the handbook. And I understand your argument that the handbook can't be a contract. But it independently says, I agree to the terms of the arbitration agreement. So don't we have a very different situation here? The arbitration agreement was a standalone document, and he agreed to it. The fact that it's cross-referenced in the handbook doesn't seem to be something that could make it less binding. Well, it's not just that it's cross-referenced, Your Honor. It's literally signing pages of the document of the arbitration agreement. The only place the arbitration agreement lives is on pages 28 to 32 of the handbook. And if you look at page 114, which is the acknowledgement form, that's the acknowledgement form that Mr. No signed in connection with page 161. That is the language that says this is neither expressed nor implied contract. But perhaps more importantly, Your Honor, this situation is undoubtedly messy. We have interlocking documents, two of which are signed, that appear to point in different directions. A handbook that says it's not a contract, a signature that says I agree to the arbitration agreement, and a separate acknowledgement that says this is not a I'm sorry, Judge Radji, you're muted. Can you hear me now? Yes, thank you. I'm sorry, it took a little effort to do that. I wanted to take you back a moment to the offer letter that your client signed. I think that's August 18th, 2009. There are any states that he agrees to resolve any claim arising from his employment by arbitration. Why isn't that also reflective of an arbitration agreement? Well, Your Honor, Oppenheimer has not argued that, did not argue it below nor before the district court. Well, can you answer for me why it's not? Well, Your Honor, I would argue that it's not because of the subsequent disclaimers in the handbook, because the only place that the terms of arbitration are set forth is in the terms of the handbook. So pages 28 to 32 are the logistics of arbitration, so to speak. And so you need to combine those two. So again, you have something that indicates that it could be a contract and something that indicates that it is not. And again, New York law says under those circumstances, we do not have a contract. Judge Walker, isn't it perfectly reconcilable to have a handbook that is not binding and to which the disclaimer applies, but to have an agreement within the handbook separately signed that that is a contract? Why is there any confusion over that? It seems to me that, as you point out, the handbook itself is not a contract. But we're not talking about the handbook. We're talking about the arbitration agreement. Because, Your Honor, the arbitration agreement is literally labeled as part of the handbook and the acknowledgement that this is not a contract applies to the entire handbook. Well, if the arbitration agreement were a separate document, you know, perhaps an exhibit, a separate document. You wouldn't have an argument, would you? Correct, Your Honor. That's correct. Why does it change just because it's within the handbook itself? It's still a separate instrument, isn't it? It is not, Your Honor, because what he is signing are literally pages of the handbook. It would be the equivalent. Let's say there was a progressive discipline policy in the handbook. If he initialed those pages, would that mean that that's a contract? I think New York law would say that it is not a contract. And, again, agreed, we have different permutations here. But the clarity with which Oppenheimer must prove that it's a contract requires there to be no implication. We would have to read out the disclaimer that says that the handbook is neither an express nor implied contract in order to convert these pages into a contract. In other words, as I understand Oppenheimer's position, this is an express contract because pages 28 to 32 are signed. Well, the disclaimer says you cannot have an express contract. So we have two things going on at the same time, a document that purports to be a contract and not a contract at the same time. And under well-settled New York law, that means we defer to the no contract rule. And so I will reserve the rest of my time. Thank you. Thank you, Mr. Likul. Mr. Gibson, you have ten minutes. Good morning. May it please the court, I am Michael Gibson on behalf of the appellee Oppenheimer & Co, Inc. And the appellant's argument fails for two reasons. First, the argument ignores the fact that the appellant who holds a law degree and a certification in European arbitration, as the court has noted, agreed three times in writing to arbitrate his disputes with Oppenheimer. He did so within his offer letter. He did so within a separate document titled Arbitration Agreement that he signed the day he started working for Oppenheimer. And he did so a third time in November of 2014 when he electronically affirmed first, having received the 2014 handbook, and then, as Judge Nardini pointed out, separately affirming, yes, I agree to the terms of the arbitration agreement. And those three agreements are separate, they're distinct, and by their terms are entirely mandatory. And the appellant here has been unable to point to a single authority in this circuit where a court has refused to enforce a separate, distinct, mandatory arbitration agreement simply because an accompanying employee handbook provides that that particular policy does not create a contract of employment. And as the district court noted, the Lobosco case and the other authorities cited to by the appellant is fundamentally different because there was no separate, distinct agreement to arbitrate. And it's also important to note, Your Honors, that both versions of the employee handbook that Mr. Noh points to provide very clearly that the terms of the handbook do not affect any separate written agreements between the employee and Oppenheimer. And that if there were any conflicts between a separate agreement and the handbook, that the terms of the written agreement would apply. Now, finally, on this issue, Your Honor, even if this case were in line with the authority cited to by Mr. Noh, where you weren't dealing with a separate, distinct arbitration agreement, but rather an arbitration clause that was buried within the terms of an employee handbook, his argument still fails. And that's because district courts in the circuit have held that even under those circumstances where you have an employee handbook with limiting language, if there's an arbitration clause that makes clear that its terms are mandatory and the employee's employment is subject to that agreement to arbitrate, the employer can still enforce that arbitration clause. And two such cases are Brown v. St. Paul's Travelers and Isaacs v. OCE Business. And if you look at the first line of both the 2009 arbitration agreement and the 2014 arbitration agreement, it starts, Your employment with Oppenheimer and Co. Inc. is subject to your agreement to a pre-dispute arbitration clause. And, in fact, further down it says, In consideration of my employment or continued employment, I agree to arbitrate. There is no such limiting language in any of those agreements. As such, I believe the district court got it right, that the court was proper in compelling arbitration. And unless the panel has any questions for me, I will move on to the order denying motion to vacate. And to that end, it's well settled that a party must meet a very high burden in order to vacate an arbitration award on the grounds of manifest disregard. As this court held in Duferco Steel, that burden is only met in exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent. And I also respectfully submit that it's not enough for the court to disagree with the holding of the arbitrator. Rather, as this court held in TECO Metals, the award must be enforced, quote, if there is a barely colorable justification for the outcome reached. And here, your honors, not only did the arbitrator, a retired United States magistrate judge, have a colorable justification for his finding, which dismissed Mr. Noe's claims, he had a robust factual record supporting his finding. And as the district court held, Mr. Noe's motion to vacate the award is in fact an impermissible challenge to those factual findings. And most importantly, the factual finding that Mr. Noe had his supervisory responsibilities removed on July 14th, 2014, which was before he ever went on an FMLA leave of absence and was before he ever indicated that he wished to take an FMLA leave of absence. The evidence reflected that Oppenheimer on multiple occasions made Mr. Noe aware of what his rights were insofar as taking up to 12 weeks of unpaid FMLA leave for the birth of his child. And there was evidence, including the testimony of Mr. Noe's supervisor and two of his coworkers, which was credited by the arbitrator in his award, that Mr. Noe elected not to take an FMLA leave for the birth of his child, and instead desired to work remotely and to continue to get paid, which he in fact did. Counsel, can I just ask you to clarify? You've said a number of times that he didn't ask to go on FMLA leave. Is it your position that he asked to go on some other form of leave, or is it you're saying that he just was working remotely and wasn't going on leave at all, right? Isn't that what I understand your argument to be? Exactly, Your Honor. Before Mr. Noe departed for California for the birth of his child, he spoke to Human Resources. Human Resources pointed him to the employee handbook, which provides Oppenheimer's FMLA policy and the procedures that must be followed to obtain FMLA leave, which is unpaid under Oppenheimer's policy. Mr. Noe, in discussions with his supervisor, Mr. Roentgel, and his coworkers decided, I do not want to go on an unpaid FMLA leave. I'm going to go to California. I'm going to work remotely, and I wish to continue to be paid. But again, can I just ask you, again, you've said that a number of times. He did not ask to go on an FMLA leave. Are you suggesting that he asked to go on a different form of leave? No leave at all, Your Honor. Okay, so when you keep saying FMLA leave, I keep wondering whether you're trying to make a distinction between, yes, he wanted to go on a leave, but it wasn't technically the kind of leave that falls under the FMLA. And again, I thought your argument was he didn't ask to go on leave at all. He just asked to work from San Francisco. That's exactly right, Your Honor, and I apologize if I'm confusing, if I'm, if I was confusing in that manner. Mr. No was working remotely from California and getting paid, never once called up Oppenheimer or emailed Oppenheimer and said, wait a second, why am I getting paid? I'm on a leave. In fact, to the contrary, subsequent to the July 13th, 2014 email, which Mr. No unsuccessfully argued was somehow his notification that he was going on an FMLA leave, an email that didn't reference the FMLA, didn't reference a leave of absence, didn't request time out of the office. Simply said, I'm not coming back until August 25th. Days after sending that email, Mr. No sent an email to his colleague offering to take on additional remote work responsibilities. And the two recipients of that July 13th, 2014 email, neither of whom was authorized to approve an FMLA leave or disapprove one, even if it could constitute a request, both testified that they understood that that email to be Mr. No simply stating that he was going to unilaterally continue the status quo, i.e. working remotely from California, which he continued to do and continue to get paid. Now, several weeks later, Mr. No suffered a brain aneurysm in mid-August of 2014. And it was at that point that he did go on an FMLA leave, that he did come off Oppenheimer's payroll. But Mr. No's supervisory responsibilities, the adverse appointment action at issue here were removed weeks earlier. And when Mr. No came back to work at Oppenheimer in November of 2014, he was returned to the same exact job title with the same exact salary that he had when he went on an FMLA leave in August of 2014. In fact, Mr. No was making the same $150,000 base salary when he was terminated by Oppenheimer a year and a half later in June of 2016, that he was making the day that he went to California in June of 2014 for the birth of his child. The only reduction in compensation that Mr. No incurred was reduction in two discretionary production-based bonuses, annual discretionary production-based bonuses, which the arbitrator relied on well-settled law that an employer is entitled to take into account time out of the office, including time out on FMLA leave, when awarding discretionary production-based bonuses. And then finally, the award, there was a factual basis for the finding that a year and a half after his FMLA leave, Mr. No was terminated by Oppenheimer. And he was terminated at a time when Oppenheimer had just suffered two of its worst financial years in recent history, including the financial crisis. And more importantly, there was evidence that Oppenheimer had ceased doing business altogether in the industries that Mr. No was a research analyst for. And in fact, Oppenheimer never hired any research analyst to replace coverage for those sectors. And for those reasons, I respectfully submit that the appellant has not come close to establishing that this award qualifies as one of the exceedingly rare circumstances where an award should be vacated on the grounds of manifest disregard for the law. Thank you very much. Thank you. Mr. Likul? Yes, Your Honor. You have two minutes for rebuttal. Yes, thank you. We are not challenging the arbitrator's findings of fact, even though we may disagree with them. We are challenging the standard used by the arbitrator to determine when FMLA protections kick in. The arbitrator repeatedly looked for Mr. No to either request or be placed on leave before he found that the FMLA protections kicked in. In fact, this court has made clear that the protections of the FMLA kick in when the employer has reason to know that the FMLA may apply. And in this case, that July 13th email has all of the necessary elements to let Mr. Lowenthal know that the FMLA may apply. Mr. No stated that his daughter was two weeks old, that she had a health condition that prevented her from traveling, and that he would, quote, be back in the office by August 25th. You don't need to be clairvoyant to think that the FMLA may apply here. And it is undeniable that Mr. Lowenthal then demoted Mr. No because of that July 13th email. In fact, only a few days later, he sends Mr. No FMLA papers and admits that the reason for stripping Mr. No of his responsibilities, which the arbitrator found was in fact an adverse action and a demotion, was because of the leave, Your Honor. And so it is, it is the case. Counselor, Judge Walker, I, your adversary made the point that he continued working during that period of time. How is that consistent with getting FMLA leave? Well, no, Your Honor, he did not continue working, Your Honor. He he was already demoted. And at the point it was that that's not inconsistent with working. He was working. He still had his computer. He was working and and he wasn't doing he didn't have the authority that he had before. But he he still had work and he was and he was working to in earning money during that period of time. But by that point, he is demoted. It is inconsistent because once he sends the July 13th email, the adverse action is stripping him of his supervisory responsibilities. That completes the violation because it's at that point that the employer took an adverse action because of a situation in which the FMLA may apply. That's not what I'm asking. I'm asking the question. The fact that he continued working at whatever level with whatever supervisory or lack of supervisory responsibilities he may have had is inconsistent with taking FMLA leave. And you're arguing that his MFLA leave started in July. No, I'm sorry. I'm not arguing that. I apologize. What I'm arguing is that Mr. Lowenthal was prohibited from taking an adverse action in response to the July 13th email. It matters not that Mr. No continued working. What matters is that he gave Mr. Lowenthal sufficient information to let Mr. Lowenthal know that leave may apply. In response to that notification, Mr. Lowenthal took an adverse action, which is a demotion. I understand that part. I'm still a little confused about how it's consistent with his intent to have FMLA leave for him to continue working. Well, Your Honor, respectfully, the point is that the trigger for FMLA protection doesn't require him to specifically ask for FMLA leave or even take it just to provide sufficient notice that it may apply. And so that's our argument. I apologize if I was confusing you in my answer. All right. Very good. Thank you to both counsel. That was very well argued. We thank you for your assistance and we'll take the case under advisement.